**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------- X

UNITED STATES OF AMERICA,

               v.                                     Case No. 24-CR-028 (NM)

Isaiah Dukes,

                            Defendant.
-------------------------------------------------------------------- X

## SENTENCING MEMORANDUM ON BEHALF OF ISAIAH DUKES

                                                    Dawn M. Florio, Esq
                                                    DAWN M. FLORIO LAW FIRM
                                                    488 Madison Avenue, 20th Floor
                                                    New York, NY 10022
                                                    212.939.9539

                                                    Attorney for Isaiah Dukes

Dated:  October 24, 2024

To:    Honorable Nina Morrison
         Assistant United States Attorney Rebecca M. Schuman
         Assistant United States Attorney Gilbert Rein
         US Probation Officer Cheyanne S. Ralph

## **TABLE OF CONTENTS**

I. RELIEF SOUGHT

II. INTRODUCTION AND SUMMARY OF CASE

    A. SUMMARY

        THE PLEA OF GUILTY

III. ARGUMENT

    A. SENTENCING PURSUANT TO 18 U.S.C. § 3553(a)

IV. HISTORY AND CHARACTER OF THE DEFENDANT

V. SENTENCING REQUEST

VI. ATTACHED CHARACTER LETTERS

## I. RELIEF SOUGHT

Defendant Isaiah Dukes, by and through his attorney of record Dawn M. Florio, Esq. pursuant to 18 U.S.C. § 3553(a) hereby respectfully submits this Memorandum requesting the Court sentence Mr. Dukes to a non-guideline sentence of seven months, which is justified by the circumstances and factors to be considered, and is sufficient, but not greater, than necessary to comply with the purposes of sentencing.

## II. INTRODUCTION AND SUMMARY OF THE CASE

This Memorandum is respectfully submitted on behalf of our client, ISAIAH DUKES, who is scheduled for sentencing on November 7, 2024 at 2:00 PM. Provided herein is pertinent background and legal argument for your Honor's consideration in determining the appropriate sentence. Mr. Dukes waives the required notice period for the Presentence Report pursuant to Federal Rule of Criminal Procedure 32(e).

### A. SUMMARY

Isaiah Dukes was arrested on September 29, 2022, on October 28, 2022 he was released on a $350,000 Recognizance Bond and home confinement. On November 23, 2022 the complaint was dismissed[1]. On January 24, 2024 Mr. Dukes was re-indicted in a two count indictment. A federal hold was placed on February 19, 2024, and Mr. Dukes was brought to federal custody via writ on April 3, 2024, and was detained. The indictment charged Mr. Dukes with Possession of a Machinegun in violation of 18 U.S.C. § 922(o) and Possession of an Unregistered Firearm in violation of 26 U.S.C. § 5861(d).

**The Plea of Guilty**

On May 30, 2024 the Defendant appeared before the Honorable Taryn A. Merkl, Magistrate Judge, and pled guilty to Count One of the Indictment. Probation calculated the offense level as

---

[1] Mr. Dukes was initially charged with being a felon in possession of a firearm, however it was determined that Mr. Dukes did not have any felony convictions prior to this case.

3

15 and the criminal history category as II. The guideline range at this level is 21 to 27 months' imprisonment.

### III. ARGUMENT

#### A. SENTENCING PURSUANT TO 18 U.S.C. § 3553(a):

In accordance with the Supreme Court's decision in <u>United States v. Booker</u>, 543 U.S. 220 (2005), and the Second Circuit's decision in <u>United States v. Perez</u>, 397 F.3d 103 (2d Cir. 2005), the sentencing court must consider all of the factors identified in 18 U.S.C. § 3553(a), including the advisory Sentencing Guidelines (the "Guidelines") established by the United States Sentencing Commission. Those factors are, in relevant part:

> (1) The nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) The need for the sentenced imposed:
>
>> a. To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> b. To afford adequate deterrence to criminal conduct;
>>
>> c. To protect the public from further crimes by the defendant; and
>>
>> d. To provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) The kinds of sentences available;
>
> (4) The kinds of sentences and the sentencing range established for the applicable category of defendant as set forth in the Guidelines;
>
> (5) Any pertinent policy statement issued by the Sentencing Commission;
>
> (6) The need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct;
>
> (7) The need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

4

A sentencing court is permitted to find all the facts appropriate for determining a sentence, whether or not that sentence falls within the Guidelines. See Perez, 397 F.3d at 114-15.

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court held that the mandatory Sentencing Guidelines system violated the Sixth Amendment. Pursuant to the Booker remedial opinion, and as further explained in subsequent Supreme Court cases, the sentencing court is to apply the factions as set forth in 18 U.S.C. § 3553(a). Section 3553(a), "as modified by Booker, contains an overarching provision instructing district courts to 'impose a sentence sufficient, but not greater than necessary' to accomplish the traditional goals of sentencing." United States v. Kimbrough, 123 S.Ct. 558, 570 (2007) (citing sentencing goals set forth at 18 U.S.C. § 3553(a)(2)(A)-(D)).

The district court need not presume the Guidelines range is reasonable, and it must make an individualized evaluation of the facts and circumstances before it. In so doing, the sentencing court should consider the possibility that a Guidelines sentence is not just unnecessary to accomplish the goals set forth in § 3553(a), but that such a sentence would be "greater than necessary" – put differently, that a Guidelines sentence will actually thwart application of § 3553(a)'s command to impose the minimum sentence necessary to achieve the goals of sentencing. Rita v. United States, 127 S.Ct. 2456, 2465 (2007). The court is "free to make its own reasonable application of the § 3553(a) factors, and to reject (after due consideration) the advice of the Guidelines." Kimbrough, 128 S.Ct. at 577 (Scalia, J., concurring).

In addition the heightened risk to inmates in federal correctional facilities during the COVID-19 pandemic exposed serious problems within our prisons and jails which warrant consideration. In Davis v. Ayala, 135 S. Ct. 2187, 2209 (2015) Justice Kennedy, concurring, called for heightened judicial scrutiny of the projected impact of jail and prison conditions on a defendant. See Id.. In United States v. Mateo, 299 F. Supp. 2d 201, 212 (S.D.N.Y. 2004) the Honorable Victor Marerro, a District Judge in the Southern District of New York, granted a downward departure

5

where the defendant's pretrial conditions were "qualitatively more severe in kind and degree than the prospect of such experiences reasonably foreseeable in the ordinary case." Judge Marerro also stated that "potential conditions of confinement that a particular defendant is likely to encounter while in custody after sentencing" merit consideration, citing to Koon v. United States, 518 U.S. 81 (1996). See also United States v. Lara, 905 F.2d 599, 601 (2d Cir. 1990) (upholding a downward departure grounded on defendants potential for victimization in prison).

## IV. HISTORY AND CHARACTER OF THE DEFENDANT

ISAIAH DUKES is 27 years old and was born in Chicago, Illinois. He has completed his high school diploma. Mr. Dukes is employed as a musician, recording music under the name Lil Zay Osama, he is signed to Warner Music Group. Mr. Dukes' history and character are fully recounted and explored in the consulting report, which is attached to this memorandum as Exhibit 1, and therefore not recounted here.

### A. History of Drug Abuse, Mental Health Issues, Physical Condition

Isaiah Dukes has no history of substance abuse, and minimal history of substance use. Mr. Dukes recounted that he has smoked marijuana previously, mostly to try it and see why others enjoy it. Mr. Dukes is a social drinker. He first tried alcohol in 2019, and drinks on occasion when at parties or other events.

When Mr. Dukes was 14 years old he was shot in the right side of his chest. Mr. Dukes was outside when a fight broke out between two unknown females. Police responded to the scene, at which point gunfire erupted and Mr. Dukes was hit. Mr. Dukes did not appear to be the intended target of any shots, and does not know who shot him. He was rushed to a hospital, he does not recall which one, and released a few hours later.

Mr. Dukes suffers from anxiety, which he believes is related to his upbringing. It is possible that Mr. Dukes has Post Traumatic Stress Disorder, as he saw friends shot and killed at a young age.

6

## V. HARSH CONDITIONS AT MDC

Under 18 U.S.C. 3553(a), the District Court can consider harsh conditions of the Defendant's pre-trial confinement which may merit mitigation. Numerous District Courts have agreed that the Metropolitan Detention Center ("MDC") is a facility which is harsh and inhumane and this warrants consideration for mitigation. The conditions in this facility are shocking and unacceptable.

The Second Circuit has held that "pre-sentencing confinement conditions may in appropriate cases be a permissible basis for a downward departure." See, United States v. Francis, 129 F. Supp. 2d 612 (S.D.N.Y. 2001) (departing one level because of harsh conditions of pre-trial confinement). Likewise, District Courts have mitigated or departed downward on the grounds of the harsh conditions of the MDC and MCC for those awaiting trial and sentencing. See, United States v. Mendola, S2 03 Cr. 449. (the Court took into consideration the harsh conditions of Mendola's confinement at MCC and departed from the recommended sentence by 10 months.) See also, United States v. Mateo, 299 F. Supp. 2d 201, 212 (S.D.N.Y. 2004); United States v. Hernandez- Santiago, 92 F. 3d 97, 101 (2nd Cir. 1996) (the court departed three levels based on 22 months of harsh confinement in the facility); United States v. Lara, 905 F.2nd 599 (2nd Cir. 1990) (the district court departed from a guideline of 121 – 151 months, imposing the minimum sentence of 60 months. This decision relied in part, on consideration of the defendant's harsh confinement while awaiting trial and sentencing).  See e.g. United States v. Carty, 264 F.3d 191 (2d Cir. 2001) (holding, per curium, that abnormally harsh presentence conditions can be grounds for a downward departure), United States v. Mateo, 299 F.Supp.2d 20l (S.D.N.Y. 2004) (downward departure of nine levels where denial of medical attention and sexual harassment of a female inmate "inflicted forms of pain and suffering that have effectively enhanced, to a disproportionate degree, the level of punishment contemplated to be experienced by inmates in the typical case during the period of incarceration proscribed by the Guidelines"); United States v. Speed Joyeros, 5.A., 204 F. Supp. 2d 412, 441 (E.D.N.Y 2002) (Judge Weinstein downwardly departing because of, inter alia, "the physical deterioration of the defendant" while in pretrial custody).

The Supreme Court recognized that because pre-trial confinement is an administrative, as opposed to judicial form of detention, the confinement must not rise to the level of punishment or otherwise violate the constitutional rights of those detained. See, Bell v. Wolfish, 441 U.S. 520, 537 (1979). Judge Weinstein of the Eastern District observed, "[t]he inevitable consequences of pre-trial incarceration, particularly when prolonged beyond a short period, are undeniably severe." See, United States v. Gallo, 653 F Supp.2d 320 (EDNY 1986).

In Gaston v. Coughlin, 249 F.3d 156, 164-165 (2nd Cir. 2001), the Second Circuit held that rodent infested units and the presence of human waste in and around cells can constitute cruel and unusual punishment. Former Eastern District of New York Chief Judge Jack Weinstein also determined that inhumane conditions and lengthy pre-sentence detention conditions can violate due process. The unusually harsh conditions at MDC deprive pre-trial inmates of their constitutional rights and have not kept up with contemporary standards of decency. They represent substantially harsher conditions from those the defendant would have experienced if he had been designated to a federal prison camp or low security prison. In other words, during the period that the Defendant has been incarcerated, he has been punished more than a similarly situated offender who serves the same time of detention at a minimum-security prison.

These conditions were highlighted in 2021 by the former Chief Judge of the Southern District of New York, the Honorable Judge Colleen McMahon[2]. According to a transcript of the April 29th, 2021 sentencing in United States v. Days, 19-CR-00619 obtained by the Washington Post and New York Daily News Judge McMahon stated that there is "no excuse for the conditions" in the MDC and MCC and that the "treatment of… prisoners, the inmates, in the last 14 months have been nothing short, in my opinion, of inhumane, cruel and harsh, and unreasonably unjust."[3] Judge McMahon

---

[2] Judge McMahon stepped down as Chief Judge when she took senior status on April 10, 2021.
[3] Shayna Jacobs, Judge says 'morons' run New York's federal jails, denounces 'inhuman' conditions (May 7, 2021) https://www.washingtonpost.com/national-security/jails-run-by-morons-judge-says/2021/05/07/3b8b00c4-af46-11eb-acd3-24b44a57093a_story.html; IN HER OWN WORDS: Federal Judge slams 'morons' running NYC Federal Jails (May 7, 2021) https://www.nydailynews.com/new-york/ny-judge-mcc-mdc-20210507-nhcuujw6kjbmnm7qjus5pfrpdm-story.html

called the conditions "as disgusting [and] inhuman as anything I've heard about [in] any Columbian prison."[4] Judge McMahon continued saying "[t]he single thing in the five years that I was Chief Judge of this court that made me the craziest was my complete and utter inability to do anything meaningful about the conditions at the MCC… and the MDC, two federal correctional facilities located in the City of New York that are run by morons."[5]

In May of 2021 the New York Post reported on a sentencing before the Honorable Judge J. Paul Oetken wherein Judge Oetken likewise highlighted the brutal and inhumane conditions at these facilities, stating that the conditions were "extraordinarily harsh" and that the frequent lockdowns impose conditions that are "basically like solitary confinement." Inmates have limited programming, next to no family visits, and severely limited ability to meet with lawyers. Judge Oetekn further stated that "because it's been harsher than a usual period that it's more punitive, that it's essentially the equivalent of either time and a half or two times what would ordinarily be served… [s]o I think having served 24 months is equivalent to having served three years."[6] The conditions in the MDC are similarly severe and should be similarly credited.

In the past three years the conditions at the MDC have not improved, in fact it appears that they have devolved significantly. For example in United States v. Chavez, 22-CR-303-JMF (S.D.N.Y.), Dkt. 31, Judge Furman issued a 19 page opinion calling out the terrible conditions in this facility. Judge Furman specifically highlighted constant lockdowns which are tantamount to solitary confinement, ignored medical orders, and inhumane housing which exposes inmates to visible mold, contaminated drinking water, and vermin infestation.

Simply put the conditions that Isaiah Dukes has experienced since being remanded are unacceptable at even the best of times. The conditions that Mr. Dukes and other inmates have described are deplorable, unacceptable, and shocking to the conscience.

---

[4] Id.
[5] Id.
[6] Stephen Rex Brown, NYC federal jail is so bad inmates get 'time and a half': Judge (May 24, 2021) https://www.nydailynews.com/new-york/ny-mcc-mdc-hard-time-20210524-cwatz2asojglhm4cvjldbdx33e-story.html

9

During the pandemic, and after, the facility has frequently been on lockdown, sometimes for more than a week at a time. On these occasions inmates are confined to a 6 foot by 10 foot cell with another individual for up to 23 hours a day. On weekends inmates are frequently unable to leave their cells at all due to understaffing. One inmate reported that from when he arrived at the MDC on February 1, 2023 to April 9, 2024 the facility was locked down for 231 out of 433 days. Since Mr. Dukes has been at the MDC there have been numerous and frequent lockdowns, as multiple people have been killed within the facility.

The MDC is dirty and inmates live in squalor. Due to the frequent lockdowns, and the fact that the facility is overcrowded, social distancing is impossible if an inmate gets sick. During the fall and winter it is cold in the facility and inmates are not given sufficiently warm clothing or blankets.

The medical department is understaffed and those staff are not properly trained. It can take an inmate more than one month to see medical staff after making a "sick call," if they see medical staff at all. Most sick calls are dismissed with minimal inquiry. The dental department is understaffed and improperly trained. Dental calls can take months to be answered. Mr. Dukes was in the middle of getting dental work done when he was arrested, this dental work has not been completed in the MDC. Mr. Dukes relays that he has experienced cracked teeth and crowns which have come unattached without proper intervention. There is no indication that Mr. Dukes will be able to receive the proper dental care until he is released.

There is a lack of programs and educational opportunities within the MDC. The maximum level of security is imposed on pre-trial detainees.

In addition, the facility and its conditions are shocking and unsanitary. There is no washing machine or dryer readily available. Inmates may only wash their clothes and exchange bedding once per week. Inmates have reported that during the lockdowns inmates have sometimes had to go weeks without being able to do laundry, as a result they must wear dirty underwear and sleep on dirty bedding. Computer terminals are rarely cleaned. Due to limited cleaning supply access, inmates are constantly in danger of transmitting diseases in shared areas. There are mice and rodents in and

10

around inmates' property. Rodents climb over inmates' clothing, belongings, and food often leaving feces. Cockroaches and other vermin infest the facility, food is frequently swarmed by flies, and inmates have reported finding cockroaches in their food. The food served to inmates is often expired, many times far past the expiration date. Recently the New York Daily News reported that food being served to inmates was often infested with maggots[7].

The sinks in most of the cells are broken. Toilets expel water onto the floor, leaving a foul odor and spreading bacteria. Toilets which are broken often remain unrepaired for substantial periods of time. Water is often shut off for hours at a time while inmates are locked in their cells; as a result, inmates cannot take a shower or wash their hands. Toilets frequently do not flush, requiring inmates to cover toilets with a towel to block the smell of urine and feces. When they do flush they may only flush twice every 45 minutes, which often requires inmates to deal with the smell of urine and feces even when toilets are working.

There have been numerous days where toilets were unusable due to plumbing issues. At times when the water is turned off inmates have been forced to urinate or defecate in buckets and bags. Cells have a contaminated odor of human waste and sewage; the odor causes nausea, discomfort, and vomiting. This odor makes it difficult for inmates to peacefully rest.

Showers are consistently without regulators and/or showerheads. Floors in the showers are damaged; they have sharp edges and mold. Shower curtains are rarely replaced or washed, and are usually torn and covered in mildew. Tattered shower curtains allow water to splash on the floor outside the showers causing the floors within to be slippery and dangerous. Water temperature is generally uncontrollable, on occasion exceeding 170 degrees Fahrenheit; these excessive temperatures have caused burns on several occasions.

There is a lack of cleaning and hygiene supplies. Inmates are forced to purchase bars of soap to wash their hands. Toilet paper is supposed to be issued once a week, but there have been instances

---

[7] John Annese, Maggot-infested meals being served to inmates at Brooklyn federal jail, lawyers say (March 30, 2024) https://www.nydailynews.com/2024/03/30/maggot-infested-meals-being-served-inmates-at-brooklyn-federal-jail-lawyers-say/

11

where weeks have gone by without the issuance of toilet paper. Cleaning supplies are rarely issued for in-cell use, and those that are issued are of poor quality. Spray bottles are rarely operable and cleaning solutions appear to be diluted. Gloves are not provided for cleaning the bathrooms, forcing inmates attempting to maintain a clean living environment to touch human waste with bare hands. Spills and flooding are cleaned up with blankets and jumpsuits that staff then require inmates to use.

There are no means of ventilation in the bathrooms. Due to this lack of ventilation, condensation builds up on the ceiling and drops down onto the clothes and inmates alike. The MDC has ineffective and damaged ventilation and duct systems, limiting free flow of clean air. Vent covers are caked with dust and grime. Dust frequently falls onto inmates and their food when in common areas. Poor ventilation significantly increases the transmissibility of respiratory viruses such as COVID-19 and influenza.

Barbers do not have proper training and practice unsanitary work habits. Inmates have complained of being cut while receiving haircuts, and that barbers leave blood and skin particles between clippers and blades.

Living conditions in the MDC are unsafe and unacceptable. Cells housing two inmates on a more than temporary basis measure a mere 44 sq. ft.. Elevators are unstable and constantly in need of repair. Electrical outlets and wiring are damaged or nonfunctional. Inmates are afforded only one light, and a thin blanket even on the coldest of days or when the air conditioning (AC) is on full blast.

Likewise, there are issues with staff and staffing. During the morning and afternoon hours there have been occasions where just one Corrections Officer is responsible for 96 inmates. It is reported that counselors knowingly allow bullying and harassment within the population. Correctional Officers make vulgar comments, including the use of racial slurs, fostering an unsafe and volatile environment. In November of 2023, as Judge Furman stated in Chavez, it appeared that the facility was only at 55% of its full staffing level. There is no duress alarm system in areas without consistent staff coverage in violation of Policy Statement 1600.06.

The MDC permits significantly less visitation hours than other federal facilities. This is a significant policy difference which further illustrates the inhumanity of the conditions at the MDC. Counsel believes that these facts regarding the shocking and inhumane conditions at the MDC warrant mitigation. On these grounds, it is respectfully requested that the defendant's harsh pre-trial and pre-sentence confinement be taken into consideration pursuant to 18 U.S.C. 3553(a). It has been reported that the MDC failed a recent inspection. The conditions of confinement warrant mitigation.

## VI.    SENTENCING REQUEST

Based on all the factors set forth above, I ask that the Court sentence Isaiah Dukes to a sentence of seven months. While below the recommendation of Probation this sentence is appropriate given the history and character of the Defendant as well as the nature and circumstances of the offense.

### a. Nature and Circumstances of the Offense, History and Character of the Defendant

18 U.S.C. § 3553(a)(1) states that the court shall consider the nature and circumstances of the offense as well as the history and character of the defendant. These factors warrant mitigation. Mr. Dukes rose from incredibly trying circumstances, growing up "in the trenches," as he says, to become a successful recording artist. Growing up in one of the most dangerous areas of Chicago Mr. Dukes witnessed violence and crime from a young age, and did fall into a pattern of criminality as a youth. This does not increase his criminal history category, as these were juvenile matters. Mr. Dukes recounts that these experiences were what encouraged him to turn to music. While incarcerated as a juvenile Mr. Dukes began writing music, realizing that he had to make a change for himself and his family. Since then Mr. Dukes has had a meteoric rise to become a successful musician. That Mr. Dukes was able to find success after such a difficult upbringing and childhood is a testament to his talent, work ethic, and ability to succeed.

Mr. Dukes recounted that growing up as he did, in a poor neighborhood with high levels of crime and limited activities for children, it was easy to go down the wrong path. In the absence of things to do it was easy for gangs to influence young people, especially since Mr. Dukes often saw negative role models receive more praise and admiration than positive ones. Mr. Dukes has endeavored to break this cycle by using his platform as a musician to try and show a positive role model for kids. He has worked to give back to his community, and to show children growing up in the poor neighborhoods of Chicago that through hard work and honing of your craft you can succeed, even if you have stumbled before.

Mr. Dukes has engaged in a large amount of charity work in poor neighborhoods in Chicago including turkey drives, basketball tournaments, baseball tournaments, bookbag and back to school giveaways, food drives, and numerous other events. Mr. Dukes additionally helped give teenagers studio time so they could focus on developing as musicians. Mr. Dukes has also helped people in his neighborhood who are incarcerated by placing money on their commissary accounts to help make their time in prison easier.

It should also be noted that there is no indication that this firearm was possessed in connection with any other crime, nor was there any indication of an intent to use unlawfully. Mr. Dukes was in New York City to perform at the Rolling Loud music festival, as well as doing a series of interviews and other media appearances. The firearm was recovered from an Uber that Mr. Dukes and his entourage had taken to an interview in Brooklyn. Mr. Dukes has no gang affiliation, and there is no indication that Mr. Dukes, or anyone else, had any intention to commit any other crime or use the firearm. The fact is that musical artists are often targeted due to their status and perceived wealth. These concerns were particularly acute at the time of the incident due to recent events. On September 12, 2022, just 17 days prior to Mr. Dukes' arrest, rapper PnB Rock, born Rakim Hasheem Allen, was shot and killed during a robbery attempt at a restaurant in Los Angeles. Initial reporting, which was later determined to be inaccurate, indicated that the killers may have learned Mr. Allen's

14

location from an Instagram post showing him at the restaurant[8]. Within this context many musical artists were on high alert.

While Mr. Dukes has active criminal charges and a juvenile history he does not have any adult convictions which involve violence. His juvenile adjudications do involve robbery, but the large changes that Mr. Dukes has made in his life since then should be taken into account. His history as a child was fractured, marked by frequent moves to avoid violence, and he reflected the environment he grew up in in many ways. Since then Mr. Dukes has found success, and has worked to try and improve his community, rather than endangering it. He has done work within his community to try and show children and teenagers a positive example, to give back, and to reduce the violence that plagued his childhood.

The pending charge out of DuPage County is a charge for which Mr. Dukes has not been convicted or pled guilty, it appears upon information and belief that the current offer in that matter is time served. It additionally appears that neither Mr. Dukes' fingerprints or DNA were found on the weapon. Mr. Dukes was initially incarcerated on the DuPage charge starting on December 14, 2023, and has been incarcerated since that date. We request that Mr. Dukes be credited for any time served since that date.

An additional period of incarceration would pose a dire threat to Mr. Dukes music career. This career has allowed Mr. Dukes to move his family out of the violent neighborhood where he grew up, and has given him a platform to help young people avoid the same pitfalls that Mr. Dukes' encountered growing up. The fact that Mr. Dukes has this lived experience, that he grew up "in the trenches," gives him a unique authenticity and ability to speak to youth, and offer a better path forwards, to be the positive role model he lacked when growing up. The fact that Mr. Dukes has used

---

[8] These initial reports later turned out to be inaccurate, but were prevalent at the time; Nancy Dillon, PnB Rock Murder: Two New Suspects Charged (October 30, 2023) https://www.rollingstone.com/music/music-news/pnb-rock-murder-new-suspects-1234866139/

15

his platform as a musician to give back to his community is a strong indication of pro-social behavior, and the fact that Mr. Dukes can meet with success upon release.

Additionally the time served thus far by Mr. Dukes should be taken into account. Mr. Dukes served one month upon his initial arrest prior to release, then seven months since being transferred to federal custody via writ. This is a total of eight months. If the time Mr. Dukes has been incarcerated in DuPage is taken into account Mr. Dukes has served a total of approximately 12 months.

    b. <u>Seriousness of Offense Conduct, Promotion of Respect for Law, Provision of Just Punishment</u>

18 U.S.C. § 3553(a)(2)(A) states that a sentence imposed shall reflect the seriousness of the offense conduct, promote respect for the law, and provide just punishment. While below the guideline range the requested sentence is far from trivial. Additionally the requested sentence is appropriate given Mr. Dukes' status as a public figure. No individual would look at the situation Mr. Dukes finds himself in and come to any other conclusion than that crime does not pay. The requested sentence would be a just punishment for Mr. Dukes, which in turn promotes respect for the law. The exercise of mercy, when warranted as it is in this case, is core to the law being viewed as an instrument worthy of respect.

Additionally, were Mr. Dukes to reoffend, he would be subject to a violation of supervised release proceeding which could result in significant prison time. It should be noted that as an adult Mr. Dukes has not sustained any felony convictions other than this case, nor has he been charged with any kind of assaultive conduct. He has a few misdemeanor convictions for which he received sentences ranging from one day in jail to probation. While some of these involve possession of a firearm it should be noted that there is no indication that Mr. Dukes has ever possessed a firearm, or any weapon, with intent to use against another person or in connection with another crime.

16

    c. <u>Affording Adequate Deterrence to Criminal Conduct</u>

Under 18 U.S.C. § 3553(a)(2)(B) a sentence must provide adequate deterrence to criminal conduct. Mr. Dukes desired to use this period to better himself and find a way to move forward through this trying time. This understanding and desire shows that a sentence of seven months does provide adequate deterrence. The impact this conduct has had on Mr. Dukes shows that the requested sentence is appropriate. Any individual who were to look at the position Mr. Dukes finds himself in would certainly consider that a deterrent to criminal conduct, and would certainly think twice before carrying a firearm.

    d. <u>Protecting the Public from Further Crimes by the Defendant</u>

Under 18 U.S.C. § 3553(a)(2)(C) the sentencing judge must take into account the need for a sentence imposed to protect the public from further crimes by the defendant. There is no appreciable risk of further criminal conduct by the defendant. This case marks the first time that Mr. Dukes has spent more than two days in an adult correctional facility, and he is dedicated to never finding himself in this scenario ever again. The fact that he managed to turn things around after his juvenile history shows that Mr. Dukes is able to make the changes necessary to avoid any further criminality.

    e. <u>Provision of Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner</u>

18 U.S.C. § 3553(a)(2)(D) states that the court should take into account the need for a sentence imposed to provide the defendant with the needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. These needs are best served by supervised release.

The correctional treatment and rehabilitation of Mr. Dukes is best served by letting him return to the community and continue his music career and good works in his community. A sentence of seven months would serve to provide correctional treatment in the most effective manner under these circumstances. 18 U.S.C. § 3553(a)(2)(D).

    f. <u>The Kinds of Sentences Available</u>

Regarding 18 U.S.C. § 3553(a)(3) there is no prohibition on a sentence of seven months.

    g. <u>Kinds of Sentence and Sentencing Range</u>

The guideline range for this case as calculated by Probation is 21 to 27 months'. While below the guideline range the requested sentence would not be prohibited by 18 U.S.C. § 3553(a)(4)(A). This is not a case regarding a violation of probation or supervised release, so 18 U.S.C. § 3553(a)(4)(B) does not apply.

    h. <u>Pertinent Policy Statements</u>

Counsel has not uncovered any applicable policy statement under 18 U.S.C. § 3553(a)(5) that would impact the requested sentence.

    i. <u>Avoidance of Unwarranted Sentencing Disparities</u>

The requested sentence is warranted in this case, and therefore avoids any unwarranted sentencing disparities as contemplated by 18 U.S.C. § 3553(a)(6).

According to the Sentencing Commission's Data Analyzer between 2015 and 2023 there were 49 individuals in criminal history category II sentenced in the Eastern District of New York for firearms offenses primarily under U.S.S.G. § 2K2.1. The median sentence length was 19 months. While below that median Mr. Dukes' good works in the community and dedication to improving himself show that the requested sentence is appropriate. As a result of these considerations the requested sentence is not an unwarranted disparity. Mr. Dukes has served close to 12 months total, including a significant period of time in the brutal conditions of the MDC, and has a history of charity work within his community that places him in a different position from the overwhelming majority of similarly situated individuals.

    j. <u>Restitution</u>

There is no restitution, therefore 18 U.S.C. § 3553(a)(7) does not apply.

18

## VI. CONCLUSION

We strive to strike a balance between the interests of society and the rights of the individual. Each case is different. Congress has made it clear that we are not to function in purely technical terms. We respectfully ask this honorable Court to see this Defendant on human terms, and sentence him accordingly. When the nature and character of Isaiah Dukes, including his good works in the community, is taken into account along with the sentencing factors, the consulting project, and the PSR it becomes evident that a sentence of seven months is fitting for the seriousness of the crime and is also consistent with 18 U.S.C. § 3553(a), which calls for a sentence sufficient, but not greater than necessary.

Respectfully yours,

Dawn M. Florio
Dawn M. Florio, Esq
DAWN M. FLORIO LAW FIRM
488 Madison Avenue, 20th Floor
New York, NY 10022
212.939.9539

Attorney for ISAIAH DUKES